**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

ALEXANDER M. SHUKH,                Civil No. 10-404 (JRT/JJK)

             Plaintiff,

v.

                           **MEMORANDUM OPINION AND**
SEAGATE TECHNOLOGY, LLC,        **ORDER GRANTING**
SEAGATE TECHNOLOGY, INC.,       **DEFENDANTS' MOTION FOR**
SEAGATE TECHNLOGY,              **SUMMARY JUDGMENT**
UNKNOWN OWNERS AND
ASSIGNEES, and SEAGATE
TECHNOLOGY, PLC,

             Defendants.

---

James H. Kaster and Christina Parra Herrera, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402; and Constantine John Gekas, **GEKAS LAW, LTD.**, 11 South LaSalle Street, Suite 1700, Chicago, IL 60603, for plaintiff.

Charles F. Knapp, Calvin L. Litsey and Elizabeth Cowan Wright, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402; and Sarah E. Benjes, **FAEGRE BAKER DANIELS LLP**, 1700 Lincoln Street, Suite 3200, Denver, CO 80203, for defendants.

Plaintiff Alexander M. Shukh filed this action against Defendants Seagate Technology, LLC, Seagate Technology, Inc., Seagate Technology, and Seagate Technology, PLC (collectively, "Seagate"), alleging numerous claims arising out of Seagate's eleven-year employment and eventual termination of Shukh. Shukh filed a complaint in February 2010 asserting thirteen claims against Seagate. After four years of litigation only Shukh's claims under Title VII and the Minnesota Human Rights Act ("MHRA") for employment discrimination and retaliation based upon his national origin

remain.  Seagate now moves for summary judgment on these claims.  Because Shukh has

failed to present evidence upon which a reasonable jury could conclude that Seagate

discriminated or retaliated against Shukh based on his national origin, the Court will

grant Seagate's motion for summary judgment in its entirety.[1]

## BACKGROUND[2]

This employment termination case has been the subject of extensive litigation

spanning four years, involving nineteen hearings before the Court, more than fifty Court

orders, and over 500 docket entries.  The parties have produced thousands of pages of

record material, and have presented the facts identified in the following background

section as relevant to the present motion.  As the Court's analysis will show, many of

these facts are irrelevant to the ultimate legal question presented by Shukh's remaining

claims – did Seagate discriminate against Shukh because of his national origin or retaliate

against him for making complaints based on perceived discrimination.  For the sake of

completeness and to demonstrate that the Court has fully considered the myriad conflicts

---

[1] The parties also filed various motions to exclude expert reports and testimony at trial.
Because the Court will grant Seagate's motion for summary judgment on the only remaining
claims in the case, no trial will be held.  Accordingly, the Court will deny the motions to exclude
as moot.

[2] The Court recites the background only to the extent necessary to rule on the instant
motion.  A more complete recitation of the facts surrounding Shukh's termination and his
employment at Seagate as it relates to his other claims appears in the Court's previous orders.
*See, e.g.*, *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2013 WL 1197403 (D. Minn. Mar. 25,
2013); *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 6003951 (D. Minn. Nov. 30,
2011); *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 1258510 (D. Minn. Mar. 30,
2011).

and incidents of mistreatment Shukh alleges he suffered at the hands of Seagate,  the Court will lay out the facts identified by the parties before addressing the legal merits of the present motion.

## I.     SHUKH'S BACKGROUND

Shukh was born in Minsk, Belarus, in 1953 when Belarus was still part of the former Soviet Union.  (Decl. of Sarah Benjes, Ex. 1 (Dep. of Alexander M. Shukh ("Shukh Dep.") 10:17-11:24), Apr. 1, 2013, Docket No. 468.)  Shukh describes his national origin as Belarusian, Soviet, and Russian.  (Shukh Dep. 10:25-11:1, 357:13-15.)[3] Shukh speaks both Belarusian and Russian.  (*Id.* 11:20-12:2.)  Shukh also speaks English with a strong accent.  (*Id.* 361:17-25.)

Shukh holds a Ph.D. in Condensed Matter Physics and a B.S. and M.S. in Electronics and Electronic Engineering.   (Fourth Decl. of Constantine John Gekas, Ex. 12, July 20, 2012, Docket No. 324.)   Shukh is recognized as one of the leading scientists in his field, and his reputation has been one of an extremely successful

---

[3] At least one court has criticized the assumption that "Russia and Belarus are of the same national origin, because they were once part of the Soviet Union."  *See Dolgaleva v. Va. Beach City Pub. Schs.*, 364 F. App'x 820, 826 n.4 (4th Cir. 2010).  *Dolgaleva* noted that "'the term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came.'"  *Id.* (alteration omitted) (quoting *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973)).  Based on this definition "[a]s a matter of ancestry, it would seem that the nations comprising the former Soviet Union are distinct."  *Id.*  Therefore, it is possible that Shukh's definition of his national origin as Belarusian, Russian, and Soviet is overly broad.  Seagate, however, has accepted this definition and for purposes of its motion uses "Belarus" or "Belarusian" to refer collectively to Belarusian, Russian, and/or Soviet national origins.  (Defs.' Mem. in Supp. of Mot. for Summ. J. at 1 n.1, Apr. 1, 2013, Docket No. 467.) Because Seagate has not challenged Shukh's definition of his own national origin, the Court will assume, for purposes of this motion, that Shukh actually possesses these three distinct national origins.

innovator in the hard disk drives engineering community.  (Benjes Decl., Ex. 12 at 28.)
Prior to 1997, Shukh had over twenty-three years of experience in his field and was
"recognized internationally as outstanding in the field of hard disk drive magnetic
recording." (Fourth Gekas Decl., Exs. 12, 14.)

## II.    SHUKH'S EMPLOYMENT AT SEAGATE

In 1997 Shukh was working in Minsk, Belarus, at the Belarusian State University
of Informatics and Radio Electronics as a researcher.  (Third Am. Compl. ¶ 35, Jan. 17,
2012, Docket No. 268.)  Seagate recruited Shukh after observing his presentations at an
international scientific conference in Louisiana.  (*Id.* ¶¶ 36-37.)  Shukh interviewed with
numerous Seagate employees before Seagate offered him a position.  (*Id.* ¶ 38; Shukh
Dep. 584:7-24.)   In September 1997 Shukh began working at Seagate's office in
Bloomington, Minnesota, as a Senior Advisory Development Engineer.  (Third Am.
Compl. ¶ 33; Shukh Dep. 31:3-9.)   After Shukh began his employment, Seagate
sponsored Shukh for an H-1B work visa, a visa extension, and finally permanent
residency status.  (Third Am. Compl. ¶¶ 80-81.)

### A.    Inventorship Accomplishments at Seagate

During his tenure at Seagate, Shukh was named as an inventor on seventeen
Seagate patents, and several of his inventions have been incorporated into Seagate
products.  (Shukh Dep. 415:9-13; Fourth Gekas Decl., Ex. 13 ¶¶ 14-15; Eighth Decl. of
Chad Drown, Exs. 1-18, Apr. 1, 2013, Docket No. 475.)  Shukh has received numerous
awards from Seagate including awards for outstanding achievement and innovation

generally as well as awards for his role in inventing specific products.  (Fourth Gekas Decl., Ex. 12 at 2; Benjes Decl., Ex. 9; Shukh Dep. 496:21-24.)  Seagate also named Shukh to the Seagate Hall of Fame for Outstanding Inventions.  (Shukh Dep. 495:21-24.)

Shukh was widely recognized during his employment at Seagate as having excellent technical skills and being an outstanding innovator.  (*Id.* 246:1-10.)  Shukh's managers consistently gave Shukh the highest ratings on performance evaluations of his knowledge, innovation, and creativity.  (Decl. of Douglas Engelke, Ex. 4 at 0110-0111, Ex. 5 at 0101, 0103, Ex. 6 at 0223, Ex. 7 at 0214-0215, Ex. 8 at 0208, Apr. 1, 2013, Docket No. 469; Benjes Decl., Ex. 20.)  Shukh's coworkers also testified that Shukh had a reputation as "a very good design person" with a "strong reputation for technical knowledge."  (Benjes Decl., Ex. 2 (Dep. of Frank E. Stageberg ("Stageberg Dep.") 102:8-14).)   Additionally, in sponsoring Shukh for the immigration statuses necessary to maintain his employment, Seagate consistently represented to immigration officials that Shukh was an outstanding researcher in his field and was an extremely valuable asset to Seagate.  (*See, e.g.*, Fourth Gekas Decl., Exs. 14, 15.)

### B.    General Competitiveness and Ability to Work with Others

Shukh testified that he has a competitive nature that "sometimes create[s] a lot of issue[s] for others."  (Shukh Dep. 247:21-23.)  Shukh testified "I was discriminated [against] by Seagate because I'm different.  I'm different [in] nationality, the language I speak, my accent, my culture, to some extent because I am challenging.  I like to challenge the problem and I was asking question[s], technical questions."  (*Id.* 379:23-380:5.)  As an example of some of the issues his nature created for coworkers, Shukh

testified that he applies a "three-strikes" rule to his interactions with coworkers. (*Id.* 271:8-18.) Under the three-strikes rule if a coworker engages in dishonest behavior three times, Shukh "just stop[s] talking to him." (*Id.* 271:13-23, 351:4-8.)

### 1.    Shukh's Managers

Shukh testified that most, but not all of his managers, described him as having a difficult time working with other people. (*Id.* 270:3-12.) For example, Shukh recalled that one of his managers had told him that he was "too competitive" and "too tough in playing by the rules." (*Id.* 360:17-19.) Early in Shukh's career at Seagate, performance evaluations from these managers reflected that he was too straightforward in criticizing other employees and their work. (*Id.* 243:5-244:12; 245:1-11, 369:21-370:12 (discussing evaluations in 1999 and 2003).) Shukh testified that his direct style in confronting coworkers about technical issues was a cultural difference, and coworkers in the United States took direct questions and discussions about technical issues more personally than his colleagues in Belarus. (*Id.* 370:1-12.)

For example, in 1999 Shukh received a rating of three out of five for organizational relationships in an evaluation from his manager at the time, Ed Murdock. (Engelke Decl., Ex. 4.) The evaluation stated that

> Alex sometimes tends to sabotage recognition and appreciation of his knowledge and efforts and to create unnecessary antagonism by advocating his ideas without doing his own critical evaluation of their strengths and weaknesses first. Also, he has shown a tendency to implicitly put down the knowledge and experience of other engineers by comments in meetings such as "that's clearly wrong" or "I know the answer" when contradicting or disputing others' work. People who know Alex well realize that this arises from a sense of enthusiasm for new ideas, but he needs to work harder to listen to and appreciate other

> peoples' ideas. . . . On numerous occasions, he has discounted the data, reservations or ideas of others as he expresses confidence in his own ideas. This has cut off discussion and leads to friction with other members of the work group.

(*Id.*, Ex. 4 at 0111.)  Shukh was given an opportunity to respond to the evaluation and stated that he agreed with the evaluation of his organizational relationship skills, but stated that these difficulties were a result of practices learned in his "former country" and he understood "that this culture is not acceptable at [a] western company." (*Id.*, Ex. 4 at 0113.)

A 2001 evaluation from manager Pat Ryan echoed Murdock's concerns, and scored Shukh at a three out of five for organizational relationships. (*Id.*, Ex. 5 at 0103.) Ryan noted that

> Dr. Shukh will continue to be plagued by organizational relationship controversies until he learns to disagree without being disagreeable. Also he needs to understand that once an issue has been thoroughly debated and a conclusion has been reached, it is very destructive to publicly insist on one[']s minority point of view. The goal is not to have a muzzled or docile posture but to know where to draw the line. He must also learn to trust his management chain to sort out controversial and interpersonal issues fairly and to ensure that he receives the accolades and recognition that he deserves. . . . I will not hesitate to issue a failing grade in the future if I don't see improvement in Dr. Shukh's ability to exercise good judgment when conflicts arise.

(*Id.*) In 2002, Shukh was given a "learning" rating (the rating one step above unsatisfactory) by manager Sining Mao for his "Respect for People." (*Id.*, Ex. 6 at 0224.) Mao noted that Shukh needed to "understand differences between [people and get] the job done for team success. Put per[so]nal ego behind." (*Id.*) A 2004 evaluation from Ryan noted that Shukh's "delivery of . . . insightful comments can be improved," and that

"all people are different. We need to keep this in mind, and assume that everybody is trying to do their best." (*Id.*, Ex. 7 at 0214.) Shukh responded that

> it is very difficult to respect a person that cheats on you and your colleagues, [is] dishonest, has a h[a]bit to steal somebody's ideas and presents them as their own, etc. In this situation there is only [one] way to keep [a] reasonable relationship with this person: try to reduce the interference with this person up to the possible limit. . . . Respect between people can be established on the mutual basis only. If somebody does not respect you how can you respect him/her? It's impossible. Personally, I experienced many times with a hid[den] disrespect and all [of] my appeals to managers were without response.

(*Id.*, Ex. 7 at 0217.) A 2006 evaluation gave Shukh the second best score for "respect for people" and "teamwork" but similarly instructed Shukh to "work to cultivate relationships with colleagues" and to "make an effort to ensure people feel that you are listening to what they have to say and are giving consideration to their positions." (Benjes Decl., Ex. 20 at 46205.) That evaluation also noted "[y]ou speak honestly and do not seek to mislead people. You can at times be harsh with others and I would like to see you work toward being more positive in your interactions with your colleagues." (*Id.*, Ex. 20 at 46206.) With respect to these evaluations, Shukh testified that he received poor evaluations despite his "absolutely outstanding performance," based solely on the difference in his "cultural behavior." (Shukh Dep. 384:7-17.)

Shukh made several references to his belief that Seagate managers were personally biased against him in responding to his performance reviews. In responsive comments to his performance review for the time period between July 1, 2003 and June 30, 2004, Shukh stated:

> People make a difference [in] every organization. This is a well-known postulate. The right people [in] the right place is a major component of

any company success.   People are very sensitive to results of their evaluation.   Therefore, a manager has a big responsibility evaluating [the] performance of his/her engineers or technicians.   Any personal bias in this situation is forbidden.   However, I feel there is a bias to me from my managers.   I have [had] this feeling for a long time.   [The] [n]ice thing is that I know the reason for that and can forgive them this bias to some exten[t].   At the end, I would like to make a comment about [the] existing system of evaluation.   [In] my mind, the existing system is too subjective.

(Engelke Decl., Ex. 7 at 0218.)   Shukh also referenced his perception of bias in his

comments to his evaluation for 2006.   (Benjes Decl., Ex. 20.)   Shukh stated:

Management style [on the team] is not a secret to me.   I found out long ago that there is a strong bias to me from the management team.   This is a fact.   I do not pretend to change it since this is useless.   I do know that [I] cannot be promoted to a higher position even though the company makes millions of dollars per year by using my inventions, my head designs and my technical proposals. . . . I would like to give to the management team one suggestion: please change some [of] Seagate's policies such as "Equal Employment Opportunity", "Performance Management", "Rewards and Recognition", etc. since they are in . . . serious contradiction with . . . reality.   Also, I can give the management team [a] couple of hints for future evaluations of my performance.   You can always give me [an "excellent" rating (the second highest rating out of four)] for not going to café during lunch time, for a strong Russian accent, etc.   I just don't know how the management team can expect a high performance from [an] employee by treating him like this.

(Benjes Decl., Ex. 20 at 46207.)

Kenneth Allen, who managed Shukh during his last three years of employment at

Seagate testified that "Alex has probably the single largest ego of any human being I ever

met.   And he is incapable of taking input from others at the level he needs to to work in

teams."   (Benjes Decl., Ex. 15 (Dep. of Kenneth D. Allen ("Allen Dep.") 180:12-15).)

Allen also testified that "[i]n general, Alex had a tendency in public forums, meetings, to

accuse other people of stealing his ideas.   He had a tendency to say they were stupid; only

his ideas were right. . . . He was basically sort of insulting in a very personal way – not critiquing the work necessarily, but being insulting in a very personal way." (Allen Dep. 149:3-10.) Additionally, Allen testified that Shukh's difficulty working with others increased during his time at Seagate and that over time he "slowly alienated just about every designer in the recording heads operations." (*Id.* 127:20-128:4.)

### 2. Shukh's Coworkers

Some of Shukh's coworkers testified that at Seagate, Shukh had "a reputation of [being] sometimes hard to work with," (Stageberg Dep. 103:20-25, 105:2-20; Benjes Decl., Ex. 16 (Dep. of Taras Pokhil ("Pokhil Dep.") 140:4-7)) being patronizing in presentations, and having a very high opinion of himself, (Pokhil Dep. 142:2-24). Seagate's brief in support of its motion for summary judgment cites a number of instances that it argues demonstrate the difficulty Shukh had working with others. Shukh contests the nature and extent of each of these incidents. Although some of these events are only peripherally related to the discrimination and retaliation claims at issue, for completeness, this Order presents a version of each story viewing the record facts in the light most favorable to Shukh.

In 2001 a controversy occurred between Niru Sharma, a Seagate engineer working in the Springfield office, and Shukh. (Allen Dep. 99:5-9.) Shukh discovered that portions of Sharma's presentation contained ideas and designs he believed should have been accredited to him. (*Id.* 99:16-20.) Shukh wrote an email to Sharma stating that "I didn't have a chance to know you personally but the very first impression about you isn't very good." (Benjes Decl., Ex. 17.) Shukh requested that Sharma "please immediately

make corrections in all presented materials" and warned her that "[w]hat you did in your presentation is [a] violation of corporate policy and some other laws.  I hope you did that without intention."  (*Id.*)  Allen testified that Shukh's reaction to Sharma was "less than constructive" because "it wasn't clear that there was any real or actual offense" and that "it doesn't tend to be the best way to further your ongoing working relationship by accusing the other person of, you know, unfair practices without at least working through the process first."  (Allen Dep. 99:16-100:10.)  Shortly after the incident, Allen reviewed the documents and sent an email in which he "agree[d] that Alex's name should have been prominently included in the package since he did most/all of the design and simulation work."  (Ninth Decl. of Constantine John Gekas, Ex. 6, May 6, 2013, Docket No. 489; Shukh Dep. 728:8-730:8.)  Allen concluded, "Let's take these actions and then take a chill pill.  When things we don't like happen, we each get to decide how to react.  I'm going to assume this was a simple oversight on Niru's part – this can be easily corrected."  (Ninth Gekas Decl., Ex. 6.)

The record also contains evidence of an incident with coworker Eric Linville.  (Allen Dep. 152:6-12.)  During a meeting, Linville allegedly expressed concern that one of Shukh's designs would not work.  (Ninth Gekas Decl., Ex. 7; Shukh Dep. 818:6-17.)  Shukh responded that he was surprised by the comments since Linville had been involved in the modeling of the design at issue.  (Ninth Gekas Decl., Ex. 7; Shukh Dep. 818:6-17.)  Linville asked to see certain materials, and after the meeting came to Shukh's office.  (Ninth Gekas Decl., Ex. 7.)  Shukh testified that Linville "jump[ed]" into Shukh's cubicle, raised his hand over Shukh, and said "Go to the street."  (Shukh Dep. 354:15-

20.)  During the incident, Shukh also stated that Linville repeatedly called him an idiot. (Ninth Gekas Decl., Ex. 7.)  With respect to Linville, Shukh further testified "[h]e attacked me, called me to the street, used all my designs.  He is [a] horrible person." (Shukh Dep. 354:9-14.)  Linville did not physically make contact with Shukh at any point.  (*Id.* 354:21-23.)

In response to the Linville incident, Shukh sent an email to his manager Sining Mao.  (Ninth Gekas Decl., Ex. 7.)  In the email Shukh stated that the day before he had informed Mao "about a rude behavior of Eric Linville against me and asked [you] to take required actions to prevent this kind of behavior in the future.  I did not hear from you so far."  (*Id.*)  Shukh also stated "Sining.  I have to admit, since you retook a position of manager on the design team a situation around me has got worse dramatically.  I am continuously under a pressure from you and other team members close to you.  I request to stop this practice and take required measures about reported accidents."  (*Id.*)  In a postscript to the email, Shukh noted "[s]ince English is not my native language and I don't have any experience in this kind of letters, I apologize in advance for an inappropriate use of some words."  (*Id.*)  Shukh later asked that Linville be made to apologize to him before he would continue working with him.  (Shukh Dep. 353:7-22.) Shukh further testified that, pursuant to his three-strikes rule, he did not talk to Linville after the incident.  (*Id.* 272:4-9.)

At some point during his employment, Shukh asked coworkers Nurul Amin and Johannes van Ek about inaccurate data they had presented, in order to demonstrate that

their own design was superior to Shukh's.  (*Id.* 352:16-353:5.)  Shukh later asked Amin and van Ek to apologize to him.  (*Id.*)

Coworker Frank Stageberg testified about a meeting during which Shukh told Stageberg that Stageberg wasn't "really a designer."  (Stageberg Dep. 54:25-55:16.) Stageberg found this comment to be disrespectful and unconstructive.  (*Id.* 64:5-21.) Stageberg testified that this statement fit his general impression that Shukh made statements that were unconstructive toward "Seagate collaborative, work-together goals." (*Id.* 65:25-66:21.)  Stageberg also recalled an incident when Shukh requested that Stageberg meet with him out in the back parking lot to have a discussion.  (*Id.* 86:9-25.) During the discussion, Shukh insinuated to Stageberg that Shukh had been promoted, and had a direct line of communication with Allen, the vice president in Shukh's area.  (*Id.* 70:15-71:24.)  Shukh told Stageberg that his modeling work on a particular project was "unacceptable, deficient, not good."  (*Id.* 71:8-12.)  Stageberg reported the incident to his boss, which was the only time he had ever talked to a Seagate manager about another employee.  (*Id.* 72:3-75:3.)

### 3.    Shukh's Collaboration

The parties do not seriously dispute that Shukh did, in fact, collaborate with other Seagate engineers during his employment at Seagate.  In his brief in opposition to the present motion, Shukh contends that he had no difficulty working collaboratively with other employees.  As evidence of his collaboration, Shukh points to papers and presentations he co-authored as well as patents he co-invented with numerous other Seagate employees.  (Ninth Gekas Decl., Exs. 3-5.)  Additionally, coworker Vladyslav

Vas'ko testified that Shukh had "a productive relation[ship]" with his coworkers. (Benjes Decl., Ex. 32 (Dep. of Vladyslav Vas'ko ("Vas'ko Dep.") 112:20-113:1).) Vas'ko further testified that the people Shukh primarily had trouble working with at Seagate were his supervisors.  (Vas'ko Dep. 114:7-17.)  Shukh also submitted evidence that he received awards from Seagate that listed Shukh as a member of a design team and thanked him for his work on the designs.  (Ninth Gekas Decl., Ex. 10.)

### C.    Requests for Transfers and Promotions

In April 2002 Shukh asked his managers, Ned Tabat and Sining Mao, to promote him to a technologist position.  (Shukh Dep. 489:17-22, 546:20-23.)  Shukh did not receive the promotion and believed that since April 2002 "management put [a] taboo" on any promotion requested by Shukh.  (*Id.* 491:5-6.)  Shukh also testified that the individuals in the position of technologist at that time were qualified for that position, and that he did not believe he was more qualified than them.  (*Id.* 548:-549:2.)

Sometime in January 2006, Shukh met with a Seagate vice president, Dave Brown, to inquire about the possibility of transferring from Seagate's advanced transducer department ("ATD") to the traducer development team ("TDT").  (Shukh Dep. 580:21-25, 744:7-14.)  Pat Ryan was the manager of ATD and Allen was the manager of TDT.  (Shukh Dep. 744:7-14.)  Ryan had had some previous discussions with Allen about the possibility of Shukh transferring teams.  (Allen Dep. 153:19-154:8.)  Ryan expressed to Allen that he "felt like it wasn't going to work for Alex anymore, that Alex was very frustrated and unhappy and upset."  (*Id.* 154:2-4.)  Ryan told Allen he "felt like

it would be a good thing for [Shukh] to move over to [Allen's] team and have a fresh start." (*Id.* 154:6-8.)

During the meeting with Shukh about the proposed transfer from ATD to TDT, Dave Brown allegedly jumped up, turned red and said "[w]hat are you doing here." (Shukh Dep. 581:1-3.) Shukh understood this comment to be questioning why Shukh had come to the United States. (*Id.* 581:3-4.) Shukh testified that he could not recall whether Brown had actually said the word "country," (*id.* 583:17-25), but later testified that Brown had said "[w]hat are you doing here in this country," (*id.* 745:10-20), and still later testified that Brown had actually asked why Shukh had come to "the USA," (*id.* 752:7-9). Brown apparently accused Shukh of hating America and told him that he needed to "know [his] place." (*Id.* 746:2-10, 752:10-11.) Shukh responded that he had come to America to work and for democracy, and asked "Why you treat me like [an] enemy? Cold War is over." (*Id.* 754:2-6.) Shukh could not recall how Brown responded to the question. (*Id.* 754:7-8.) Shukh also told Brown that he felt it was his duty to share his ideas to make America stronger, noting that at Seagate "initially people hate my ideas since they are [un]usual . . . then they accept them and put into products and so on." (*Id.* 756:10-24.)

In February 2006 Allen interviewed Shukh for the ADT to TDT transfer and allegedly told him "[y]ou must stop talking about your designs. This is team work, this is team designs. This is your last chance to work at this company, otherwise you will not find a job anywhere." (*Id.* 543:18-544:2; *see also id.* 490:4-13.) Shukh was transferred to the TDT team in March 2006. (*Id.* 650:21-24, 744:7-14.)

In August 2006, Shukh requested that Ryan promote him to the position of principal engineer. (*Id.* 578:9-17.) Ryan told him that he did not "match the corporate culture," there was "a decision" about Shukh, and therefore he could not be made manager. (*Id.* 578:9-17.) Also at some point Shukh began requesting that Ryan promote him to the position of manager of the writer team. (*Id.* 370:14-17.) Shukh testified that he asked Ryan to promote him at least three times, and Ryan told him "[n]obody will listen to you." (*Id.* 370:20-24, 388:9-14.)[4]

On September 1, 2006, Shukh wrote an email to Ryan, in response to an earlier meeting between the two. (Ninth Gekas Decl., Ex. 13 at 46217.) In the email Shukh expressed his belief that Ryan was expressing "personal bias" toward Shukh and that Shukh wished to discuss the issue with top management. (*Id.*) Ryan responded, asking Shukh to "please outline, in writing, all of the complaints/issues/wishe[s] that you have concerning your career at Seagate." (*Id.*, Ex. 13 at 46216.) On September 7, 2006, Shukh followed up with an email to Ryan, carbon-copying Allen, Brown, and Debra Reutiman – a human resources representative. (*Id.*, Ex. 13 at 46215.) In the email Shukh objected to his failure to be promoted since 2001, explaining:

> Five years in a r[o]w I've asked you in writing to promote me. You never responded. Three times I asked you personally to promote me or to give me a chance to be a technical leader of writer team (I recognized long ago that [I] cannot be a manager at Seagate, maybe since I am Russian). You always responded to my requests with the same sentence: "Nobody will listen to you?" What did you mean: my strong

---

[4] It is unclear from the record whether these three discussions were separate from the request to be promoted to the position of principal engineer. Given the similarity of the comments testified to, it appears that one of the requests for promotion to manager may have been a request to be promoted to principal engineer.

> accent or something else?  Since then I don't like to talk in public.
> Whether it is good or bad for the company I don't know but it is much
> more convenient for me.

(*Id.*)  Shukh then detailed some of his technical achievements at Seagate.  (*Id.*, Ex. 13 at

46215-16.)  Shukh also referenced his experience with receiving appropriate credit for his

work, explaining:

> You created at ATD an atmosphere of plagiarism when lot[s] of engineers
> are used to us[ing] . . . my ideas and results of my work without referring
> [to] my name for their personal advantages.  It seems to me, there is a taboo
> on my name at ATD.  My numerous appeals to ATD management to stop
> this practice were not heard, even more, I was forced to apologize in one
> case and literally attacked by my colleague in another case.

(*Id.*, Ex. 13 at 46216.)  Finally Shukh noted "August 16th in your office you said: 'There

is a decision about you'.  I have the same opinion: there is a decision about me.  I would

like to ask you: what is this decision about; who took this decision, when and why?"

(*Id.*)  Later in September, shortly after this email was sent, Shukh was promoted to the

position of principal engineer.  (Shukh Dep. 491:18-20.)

### D.      Escalation of Events in 2007

#### 1.      Human Resources Letter

In early January 2007 Allen and Mastain pressured Shukh to work on a project

with Linville.  (Shukh Dep. 434:22-435:1; Benjes Decl., Ex. 18.)  When Shukh refused,

Allen told Shukh that Shukh was "such a horrible person that nobody wants to work with

you."  (Shukh Dep. 434:18-435:4.)  When Shukh asked for evidence of other Seagate

employee's complaints against him, Allen told Shukh "[t]omorrow you will get ten of

them."  (*Id.* 435:4-9.)

On January 9, 2007, in response to this interaction Shukh wrote a letter to Seagate's human resources department, which he submitted two days later. (Benjes Decl., Ex. 18; Shukh Dep. 353:9-17, 434:18-435:13.)  In the letter, Shukh discussed his refusal to work with either Linville or Ryan until they made formal apologies to him. (Benjes Decl., Ex. 18; Shukh Dep. 353:7-22.)  Shukh also detailed some of his work on the project at issue and Seagate's failure to give him appropriate inventorship credit for his work.  (Benjes Decl., Ex. 18.)  The letter addressed Shukh's meeting with Allen and Allen's comment that by tomorrow Allen could have ten complaints against Shukh.  (*Id.*) Shukh explained:

> I reminded [Allen] that his behavior is illegal, that for the third time during last year I am facing this kind of treatment from RHO managers.  I told him, if he wants [to fire me] he should do it, but he must stop intimidat[ing me].  I added also, he can order me to take [the] project and I'd do it. However, it would be much better for the company to cr[e]ate a NORMAL working condition[] for me.  I reminded him about a history of human society when the slavery was replaced by feudalism, and the last [was] succeeded by capitalism.  The slave cannot be productive.

(*Id.*)  Shukh outlined the following thoughts and requests to Seagate's human resources department:

> - I am asking for [prevention of] this kind of treatment in the future since it violates my human rights and I cannot be efficient for the company in these working conditions.
>
> - I [am] afraid that [I] might face a provocative behavior from some of my colleagues or managers against me to create the "ten cases".  I have to point out; that all cases created against [me now] will be unfair.  I do have a reason to take this threat seriously.  For your information: In December 2005, just after [the] attack by Eric Linville, I found a flat tire on my car.  A mechanic[ at a] tire shop told me that my brand new tire cannot be repaired due to a long cut.  Moreover, he found a piece of utility knife in the tire that was a cause of the cut.  This is just information for consideration . . .

- Now I am convinced that there has been a persistent strong bias of the ATD and TDT managers against me.  Therefore, the majority results of my evaluations cannot be fair.  I would like to ask [the] HR department of the company to check results of my evaluations.  I can provide HR with copies of self-evaluations and manager evaluations during all my work with the company.

- ATD and TDT created an atmosphere of plagiarism in their organizations and support it.  This atmosphere gave an opportunity to many people close[] to the management to take advantages of other engineers['] work results for getting promotions, salary raises, and other benefits.

- Once Pat Ryan told me "there is a decision about me".  This statement and an analysis of the situation artificially created around me lead me to the conclusion that the management wants me to quit[] the company.  They might have some reason for that, which is not related to my performance defiantly.  What is it?

(*Id.*)

After writing the letter, Shukh met with Doug Engelke, a human resources representative, on January 19, 2007.  (Benjes Decl., Ex. 6 (Dep. of Doug Engelke ("Engelke Dep.") 97:25-98:7).)   At the meeting Shukh expressed his belief that his previous conversation with Allen was illegal regarding the threat to obtain ten complaints.  (*Id.* 66:5-10; Benjes Decl., Ex. 18.)   Shukh also requested that Engelke review his performance evaluations and compensation history.  (Engelke Dep. 66:13-25.) Shukh told Engelke about the incident with Linville and also requested that Engelke investigate responses to his patent applications from the intellectual property department. (*Id.* 67:11-25.)  Shukh also told Engelke that he would like to work alone.  (*Id.* 67:5-6.)

After the meeting, Engelke investigated Shukh's concerns.  (*Id.* 70:6-71:3.)   On January 24, Reutiman forwarded to Engelke the September 7, 2006 email from Shukh to

Ryan outlining Shukh's frustration with failing to be promoted.  (Ninth Gekas Decl., Ex. 20.)  Engelke also received an email from Allen regarding Shukh.  (*Id.*, Ex. 25.)  In the email Allen noted that because Shukh was objecting to working on a particular project and could not work with Linville, Allen was going to transfer Shukh out of Mastain's team.  (*Id.*)  Allen noted:

> I will assign him a series of special design projects, and will have him report directly to me.  Jason Gadbois and I will provide him with a written set of project expectations and deliverables.  We may consider physically isolating him as well, but probably not at first.

(*Id.*)  Allen testified that by physical isolation, Allen was referring to moving the location of Shukh's cubicle because at the time he was seated in the middle of the team that he was having difficulty working with.  (Allen Dep. 185:5-19.)  In addition to these emails, Engelke reviewed Shukh's evaluations and other personnel records and met with Mastain, Allen, Linville, and Paul Dietz – an intellectual property attorney that had been involved in the patent review process – and two of Shukh's coworkers, among others.  (Engelke Dep. 68-78, 89:18-19.)  Based on these complaints he received from Shukh, Engelke did not specifically investigate whether Shukh was being treated unfairly based on his national origin.  (*Id.* 121:5-6; *see also id.* 94:22-95:1.)

After the investigation, Engelke concluded that Shukh's complaints were unfounded.  (*Id.* 78-84; Benjes Decl., Ex. 21.)  Engelke met with Shukh and explained that Engelke's investigation had revealed no unfairness in evaluations, that Shukh was being compensated appropriately, and that the patent review board was appropriately communicating its decisions to Shukh.  (Engelke Dep. 81:11-82:15.)  Engelke informed Shukh that the chief technologist position he wanted to be promoted to was not an open

position.  (*Id.* 83:12-19.)  Engelke also provided Shukh with a confidential memorandum

dated February 20, 2007, which summarized Engelke's findings in response to the issues

raised by Shukh in his January 2007 letter to human resources.  (Benjes Decl., Ex. 21.)

In the letter Engelke stated that he "was unable to conclude that there have been any

violations of Seagate policy."  (*Id.*)  Engelke noted that Shukh had "been provided

written communication when the patent review committee has decided not to pursue a

patent application on an invention for which you are a named inventor.  This is in

accordance with Seagate's procedure for pursuing patent applications to protect its

intellectual property."  (*Id.*)  As for Shukh's evaluations, Engelke explained "[y]our

performance evaluations reflect your contributions to Seagate and there is no indication

any adjustments need to be made to those documents."  (*Id.*)  Engelke also addressed the

Linville incident explaining "[a]lthough you were involved in a verbal disagreement with

a coworker in 2005, it could not be characterized as an 'attack.'  Site security has no

record of a vehicle damage report being filed at that time."  (*Id.*)  Finally, Engelke noted:

> Please also be advised that Seagate has a strict policy prohibiting retaliation
> against an employee who makes a good faith report of a violation of the law
> or Company policy.  Accordingly, you should immediately advise Human
> Resources if you experience any conduct, which you believe is in
> retaliation for having made your report or having participated in this
> investigation.

(*Id.*)


### 2.   Supervision by Ken Allen

On February 13, 2007, Shukh met with Allen.  (Ninth Gekas Decl., 23.)  During

the meeting, Shukh allegedly told Allen that he would not share any more of his ideas

until he was promoted two levels and paid royalties.  (Allen Dep. 173:6-20; Ninth Gekas Decl. Ex. 21.)  Allen sent Shukh a memorandum regarding the meeting on February 20, 2007, and requested specific work product, noting that "failure to meet this request, or a more general continued failure to work cooperatively as a member of my team, will be viewed as grounds for disciplinary action up to and including termination."  (Ninth Gekas Decl., Ex. 23.)  Additionally, the memorandum noted that Shukh's stance that he would not provide ideas until he was properly recognized for past contributions and given a promotion "is inconsistent with your employment by Seagate as a Principal Engineer." (*Id.*)  In response, Shukh sent an email to Allen, carbon-copying Engelke and Brown. (*Id.*, Ex. 24.)  In the email, Shukh discussed various technical ideas, and also stated:

> I did not take any stance.  I just requested [that you] respect me like a human being and treat me equally to other people in the company.  That was it.  I understand, that you are looking for a reason [to] fire me and are preparing a ground to do that.  Your motives are clear to me.  In fact, they have very little to do with me as an employee and with my performance but I am not going to discuss them here.

(*Id.*)

At some point in February 2007, Allen decided that Shukh should report directly to him, in an effort to resolve some of the issues Shukh had been having.  (Decl. of Kenneth Allen ¶ 2, Apr. 1, 2013, Docket No. 470.)[5]  Shukh's pay, benefits, and title did not change – he merely began reporting to Allen.  (Engelke Dep. 91.)

---

[5] It is not clear when this reassignment took place in relation to the memoranda written by Allen and Engelke to Shukh regarding the February 13 meeting and the human resources investigation.

Shukh testified that during this time period he was "completely isolated" from other engineers. (Shukh Dep. 472:16-23.) Shukh described this isolation as people avoiding him and his not being allowed to collaborate with other members of the production team. (*Id.* 472:16-474:6.) Shukh testified that this was not the first time he had experienced isolation at Seagate. Specifically, Shukh alleged that his isolation from others at work began in February 1998. (Shukh Dep. 481:24-482:12, 514:23-515:7, 521:13-15.) Shukh cited examples from 2004 or 2005 when he asked to be allowed to work with a WAMR team, and was told by the leader of the team that "[n]obody will work with you." (*Id.* 477:3-18.) In 2006, one coworker asked Shukh why he had been told not to work with Shukh. (*Id.* 476:4-21.) Shukh testified that throughout his career his managers neglected his requests to have assistance from other people in developing his designs, and forced him to do difficult design point work alone. (*Id.* 508:6-24.) Shukh testified that he believed the reason for this behavior was that in his managers' "mindset I am Soviet and in their mindset they [are] still at war with the Soviets . . . . It seems to me [the] obvious explanation of their absolutely irrational behavior." (*Id.* 617:10-20.)

In July 2007, for example, Shukh learned that he had not been invited to brainstorming sessions. (Ninth Gekas Decl., Ex. 27.) James Wessel told Shukh that he had chosen not to invite Shukh because he "was concerned that your presence would not be conducive to a free flowing brainstorming session. . . . I have witnessed a few meeting interactions which made me think that your demeanor would be counterproductive to brainstorming." (*Id.*) Wessel then began inviting Shukh to the sessions. (*Id.*) In an

email related to the brainstorming sessions, Allen told Brown and Engelke that Shukh has "been much more respectful of others in the way he says things . . . and has been very responsive to my requests for modeling work." (*Id.*) Shukh also testified that the brainstorming session incident was not the first in which he had been excluded from meetings. Shukh testified that he stopped being invited to tech review sessions in November 2002 and writer team meetings from the beginning of his employment. (Shukh Dep. 507:2-122, 518:15-519:8, 520:8-521:12.) Shukh testified that he was pulled from roadmap development beginning in July 2003. (*Id.* 507:2-122, 518:15-519:8, 520:8-521:12, 601:1.)[6]

In a September 2007 meeting with Brown, Shukh testified that Brown told him that a coworker Declan Macken had received a technical award during the fiscal year, and noted to Shukh that "he is not American." (Shukh Dep. 798:12-18.) Shukh sent Brown an email about the meeting, requesting that he receive the same implementation of his ideas as others, and again raising concerns that he had not been given proper credit for his inventions. (Ninth Gekas Decl., Ex. 17.) Brown responded that his and Allen's goal "is to find a way to improve your ability to contribute to the team and also improve your job satisfaction. I realize we don't have an obvious solution right now, but that is our

---

[6] Shukh also testified generally that he was not allowed to publish papers he thought he should have been allowed to publish beginning in the fall of 1998. (Shukh Dep. 507:14-17, 519:14-20.) Shukh stated that Seagate would not allow him to publish certain results because they were sensitive with respect to the company's technology. (*Id.* 610:2-4.) Shukh later learned that other people had published on the topic. (*Id.* 601:4-8.) Shukh concluded that "there is only one explanation when you put everything together. As I told you, they simply hate me because they look at me like – treated me like the – enemy." (*Id.* 610:12-19.) Shukh also testified that other Soviet or Belarusian employees were given the opportunity to publish technical papers and that he did publish several papers during his tenure at Seagate. (*Id.* 611:3-7, 613:3-19.)

goal, regardless of what you may have inferred.  I am open for more discussion if you see fit." (*Id.*, Ex. 17 at 46410.)

### E.      Inventorship of Disputed Patents

Throughout his employment Shukh frequently expressed concern that he was not being given appropriate credit for work he performed.  This concern forms a large part of Shukh's claims against Seagate in the present lawsuit.

### 1.      Seagate's Patent Application Process

Shukh's employment with Seagate was governed by an Employment Agreement. (Fourth Gekas Decl., Ex. 9.)  Pursuant to this agreement, Shukh assigned to Seagate his

> right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets, whether or not patentable . . . which [Shukh] may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time [Shukh is] in the employ of the Company.

(*Id.*, Ex. 9 at 2.)   This provision prohibited Seagate employees from filing patent applications for their own inventions.  (*Id.*; *see also* Third Am. Compl. ¶ 107.)  Instead, employees were required to disclose inventions to Seagate by submitting an Employee Invention Disclosure Form to Seagate's Intellectual Property ("IP") Department.  (Fourth Gekas Decl., Ex. 10; *see also* Decl. of Jennifer Buenzow ¶ 2, Ex. A, Apr. 1, 2013, Docket No. 471.)   The invention disclosure form requires, among other things, a title and description of the invention, a technology classification code, and the names and signatures of each inventor.  (Buenzow Decl. ¶ 2.)  The inventors are responsible for filling out the disclosure form themselves and determining which individuals to identify

as co-inventors.  (*Id.* ¶ 4.)  The IP Department would then forward the form "to the appropriate Patent Review Board which [would] determine whether the invention w[ould] be pursued as a patent application, protected as a trade secret, or otherwise." (Fourth Gekas Decl., Ex. 10 at 1; Buenzow Decl. ¶ 3.)  If the Patent Review Board determined that an application would be pursued for patenting, Seagate would refer the application to outside counsel, who would, with the cooperation of the employee inventor(s), ensure that the applicable requirements of patent law had been met, then draft and file the necessary patent application.  (Buenzow Decl. ¶ 5.) \

## 2.       The Disputed Patents

Shukh claims that Seagate discriminated and/or retaliated against him on the basis of his national origin by failing to name him as an inventor on six issued patents and four patent applications.  (Third Am. Compl. ¶¶ 122, 196, 233.)

In his answers to interrogatories, Shukh contends that with respect to some of the disputed patents, Seagate's IP Department informed Shukh that it had decided not to pursue his inventions for patenting, but later filed patent applications that allegedly contained Shukh's inventions and failed to name Shukh as an inventor.  (Benjes Decl., Ex. 12 at 16-17, 19, 23, 26.)  For some of the disputed patents Seagate's IP Department allegedly informed Shukh that although it had decided not to pursue his particular invention for patenting, Shukh's work would be incorporated with other inventions for which Seagate would pursue patenting.  (*Id.*, Ex. 12 at 16-17; Shukh Dep. 719:5-8.) Seagate did not, however, list Shukh as an inventor in the final patent applications into which Seagate had represented it would incorporate Shukh's work.  (Benjes Decl., Ex. 12

at 16-17.)  With respect to other disputed patents, Seagate did not communicate its intentions regarding Shukh's inventions, but filed patent applications that allegedly contained Shukh's inventions and failed to name Shukh as an inventor.  (*Id.*, Ex. 12 at 20-21.)  Seagate never told Shukh that it had filed applications for any of the disputed patents, or that it had omitted Shukh as a co-inventor on the applications.  (*Id.*, Ex. 12 at 16-17, 20.)  Seagate did, however, present Shukh with inventorship awards, apparently recognizing Shukh for his work on at least two of the disputed patents.  (*Id.*, Ex. 12 at 17, 19.)

On August 30, 2007, Shukh sent an email to Kenneth Massaroni, Vice President of Seagate's IP Department, notifying Massaroni that Shukh believed he had been wrongfully omitted as an inventor on two of the disputed patents.  (Shukh Dep. 255:18-24; Benjes Decl., Ex. 11.)  Massaroni indicated that he would investigate the matter, and informed Shukh in March 2008 that the stated inventorship on the patents was correct, because Shukh was not an inventor of the patented inventions.  (Shukh Dep. 255:18-24; Benjes Decl., Ex. 11.)  Seagate did not notify the United States Patent and Trademark Office ("USPTO") of Shukh's complaints.  (Exs. in Supp. of Pl's Surreply, Ex. C (Dep. of Kenneth M. Massaroni ("Massaroni Dep.") 59:25-60:4), Oct. 23, 2012, Docket No. 360.)[7]  After receiving Massaroni's response, Shukh searched the USTPO website

---

[7] Many of Shukh's citations to the facts come from earlier submissions in the case. Shukh filed two sets of exhibits in support of his two surreply briefs to Seagate's previous motion for partial summary judgment, but labeled the exhibits consecutively as a single set. Therefore, where reference is made to "Exs. in Supp. of Pl's Surreply," exhibits A and B can be found at Docket Number 360, filed on October 23, 2012, and exhibits C through P can be found at Docket Number 383, filed on December 14, 2012.

for other patents embodying his inventions, and discovered the other disputed patents. (Fourth Gekas Decl., Ex. 13 ¶ 23.)

For the ten patents that Shukh disputes, the named inventors submitted Employee Invention Disclosures that did not identify Shukh as a co-inventor. (Buenzow Decl., Exs. A-I.) In three of these Employee Invention Disclosures other employees with Russian and/or Soviet backgrounds – Taras Pokhil and Vladyslav Vas'ko – were named as inventors. (*Id.*, Exs. A, G, I; *see also* Decl. of Douglas Engelke, Ex. 3, Apr. 1, 2013, Docket No. 469.)

### 3.    Inventorship Rights of Other Employees with Soviet Backgrounds

Shukh testified that there was one instance in which a Russian woman from Seagate's Boulder, Colorado office discussed with Shukh that an invention disclosure made by either her or a different Russian woman had been "taken over by [a] supervisor." (Shukh Dep. 409:7-410:5.) Additionally, Shukh had a conversation with Vlad Vas'ko, another Seagate employee of Soviet origin, in which Vas'ko communicated that he was unhappy about being omitted as an inventor on a Seagate patent. (*Id.* 413:21-414:6.) Vas'ko testified that on one occasion he had submitted an invention disclosure to Seagate and the content of the disclosure had been included in a patent application without naming him as an inventor. (Vas'ko Dep. 81-82.)

### 4.    Reason and Time Period for Infringement of Shukh's Rights

Shukh testified that he believed Seagate retaliated against him because of his "consistent request[s] about [his] inventorship rights." (Shukh Dep. 424:10-16, 427:10-

17.)  Shukh further testified that he thought Seagate failed to name him as an inventor because "they really hate me.  In their mind [the] Cold War was still going on." (*Id.* 581: 15-24.)

Shukh testified that Seagate stole his intellectual property "continuously from the very beginning of [his] employment through the end of [his] employment." (*Id.*.)  Shukh also testified that projects he had originated were given to others to develop, beginning in 1998.  (*Id.* 506:23-507:1, 517:2-6.)  Shukh testified that Seagate omitted his name on presentations and changed the names of Shukh's designs.  (*Id.* 620:1-621:4.)  Based on this treatment, Shukh said it was clear "they really hate me." (Shukh Dep. 620:11-14.)

F.      **Shukh's 2007 Evaluation**

In his 2007 evaluation of Shukh, Allen gave Shukh unsatisfactory ratings in the "Respect for People" and "Teamwork" categories.  (Benjes Decl., Ex. 19 at 0191, 0192. Allen explained that "Alex has demonstrated respect for some of my team members, but frankly, for very few.  He is quite open about his lack of respect for the capability, motives, and accomplishments of many members of the design community." (*Id.*, Ex. 19 at 0192.)  As for teamwork, Allen concluded that "some of Alex's behaviors severely limit his ability to collaborate effectively across the entire team – specifically, he acts as if he must always be right and he is often insistent on getting appropriate or complete credit for his work." (*Id.*)  Allen explained:

> I do understand [Shukh]'s concerns about credit for past work.  He has made a number of contributions over the years, and I have come to see over the past 6 months that he sometimes doesn't receive proper credit for work he has done in the past.  What Alex needs to understand is that much of this is self-inflicted.  For example, Alex often insists that full

> design credit be give[n] to modeled optimization of head geometries –
> clearly, geometries are critical; however, they are not high-level
> intellectual concepts and generally must be optimized experimentally.
> He has also repeatedly accused a number of different people of stealing
> his work – I have learned that several members of the design
> community now refuse to read his highlights or modeling work; they
> believe their only defense against accusations of plagiarism is to remain
> ignorant of his work.  If Alex learns to collaborate more effectively, he
> will become more effective and get more credit for his work because he
> will be able to leverage the skills and efforts of many others, rather than
> work in isolation.

(*Id.*)

## G.    Shukh's Performance in 2008

At the beginning of 2008 Shukh wrote a memo to Seagate vice president Jerry Glembocki about his performance evaluations.  In the memo, Shukh noted that he believed ten years ago Seagate's directors and managers had made "a special decision" about Shukh – that he would never become a manager because "he is too challenging, too competitive, too tough, too smart (this is not my definitions, I heard them from these people), and too different (of c[ourse], I am Soviet)."  (Ninth Gekas Decl., Ex. 18.)

In his 2008 Evaluation, Allen gave Shukh a four out of five rating for in the "Respect for People" category.  (Benjes Decl., Ex. 5 at 46658.)  Allen explained that he was "pleased with the effort Alex has put into improving his working relationships. . . . There is still room to improve and there is, unfortunately, a lot of historical relationship damage to repair, but Alex is making progress."  (*Id.*, Ex. 5 at 46659.)  Allen rated Shukh a three out of five for teamwork, explaining that "[c]ollaboration is the competency area where I would like to see the most focus on improvement in FY09. . . . I have seen signs that Alex understands these issues intellectually, but he need[s] to continue to improve

how he supports his teammates on an ongoing basis." (*Id.*)  Allen gave Shukh an overall rating of three out of five, stating:

> Overall, I am pleased with Alex's progress in FY08 – especially in the past four to six months; I would have rated Alex as a "4" performer over this time period and intend to reflect that in the KCPB cycle.  However, I have not yet seen sufficient sustained contribution to promote Alex to Grade 162 as per his request – but I will go forward out of cycle if I see improved integration and commitment to the larger team's needs, and continue to see adequate teamwork.

(*Id.*, Ex. 5 at 46661.)

### H.     Termination

In the fall of 2008, in response to the economic downturn, Seagate initiated a series of reductions in force.  (Allen Decl. ¶ 3.)  In conducting the reduction in force, Allen assigned points to employees in his department based on position elimination, performance history, documented counseling for performance, misconduct or attendance issues, technical or specialized skills, and length of service.  (*Id.* ¶ 4.)  Allen recommended the elimination of sixteen positions (ten percent of his department), including Shukh's position.  (*Id.* ¶ 6.)  In total, Seagate's Bloomington facility terminated 179 employees, including Shukh, in January 2009.  (Engelke Decl. ¶ 5.)

Allen recommended Shukh's elimination because Allen determined that elimination of one of the eight most senior staff persons would have the highest money saving potential, and Shukh scored lower than the other seven managers on the point assignment rubric.   (Allen Decl. ¶ 7, Ex. 2.)   Additionally, Allen chose to retain employees with more development and product design engineering experience than Shukh.  (*Id.*)  Allen indicated that Shukh's primary skill was RSS modeling, which was

already available at Seagate in sufficient quantity.   (*Id.*)   Allen testified that the difficulties he had with Shukh were not the primary reason for his termination but "[t]hey were part of the secondary set of factors."  (Allen Dep. 174:10-14.)   Another employee had the same score as Shukh and was identified as a peer, but was retained due to greater seniority.   (Allen Decl. ¶ 7.)   The employee retained was also not a United States national.   (Engelke Decl. ¶ 8.)   Shukh alleges that when Allen walked him out of the building on his last day, Allen wished him "every success in building a new political party in Belarus."  (Ninth Gekas Decl., Ex. 31.)

## III.   DISCRIMINATION CHARGE

### A.    Job Applications

Since his 2009 termination, Shukh has submitted 135 job applications, but has been unable to secure employment.  (Fourth Wright Decl., Ex. 4 at 31, 37-57.)   These applications resulted in only two interviews.   (Shukh Dep. 570:20-571:4.)   Shukh testified that the hiring manager at Hitachi, a company to which Shukh applied, contacted Vas'ko to discuss rumors the hiring manager had heard about Shukh.  (*Id.* 534:9-21.) Shukh attributes these rumors to the statement made by Allen prior to Shukh's termination, wherein Allen instructed Shukh to stop talking about his designs, stating "[t]his is your last chance to work at [Seagate], otherwise you will not find a job anywhere."  (*Id.* 543:22-544:2.)  Vas'ko allegedly expressed to Shukh that he would not be able to get a job at Hitachi.  (*Id.* 535:19-23.)  Mirza Abatchev, a friend of Shukh's, told him that he would not be able to get a job at Western Digital, but did not specify why.  (*Id.* 544:18-545:2.)  Additionally, during Shukh's interview at Hitachi, a Hitachi

engineer allegedly told Shukh that "[w]ith your reputation you will not find employ[ment] here." (*Id.* 541:23-542:11.)

Shukh also applied for six positions with Seagate. (Third Am. Compl. ¶ 243.) One of the positions was subsequently cancelled and the others filled either with internal candidates or applicants that were more qualified than Shukh. (*See* Decl. of Abebe Hailu, Apr. 1, 2013, Docket No. 472; Decl. of David Robinson, Apr. 1, 2013, Docket No. 473; Decl. of James Wessel, Apr. 1, 2013, Docket No. 474; Decl. of Lori Beal, Apr. 1, 2013, Docket No. 476.)

### B.    Discrimination Charge

On March 17, 2009, Shukh filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the Minnesota Department of Human Rights. (Third Am. Compl. ¶ 244.) In its response Seagate stated:

> Shukh alleges that he was subjected to discrimination on the basis of his national origin and age in connection with his employment with Seagate and that he was also retaliated against. Shukh's unsupported allegations are at direct odds with the facts surrounding his employment. After a history of combative and unproductive behavior in his working relationships, Shukh was selected for termination in connection with a Company-wide reduction in force conducted by Seagate. There is simply no merit to Shukh's claims of unequal treatment. Nor is there any merit to his allegation of retaliation.

(Ninth Gekas Decl., Ex. 26.) The EEOC issued a right to sue notice on November 25, 2009, and the Minnesota Department of Human Rights issued a notice that Shukh was to file any claim under the MHRA within ninety days. (Third Am. Compl. ¶ 245, Ex. 2.)

## IV.   PROCEDURAL HISTORY

The Court has previously considered Shukh's discrimination and retaliation claims in the context of Seagate's motion to dismiss filed earlier in the proceedings.  (*See* Am. Mot. to Dismiss, May 18, 2010, Docket No. 14.)   Although Shukh filed his third amended complaint following the Court's ruling on that motion to dismiss, the discrimination and retaliation claims presented in his amended complaint are identical to those currently before the Court in his third amended complaint.  (*Compare* Am. Compl. ¶¶ 228-262, Apr. 7, 2010, Docket No. 7, *with* Third Am. Compl. ¶¶ 228-262.)   The Court's previous ruling is therefore relevant to the scope of discrimination and retaliation claims that Shukh can now properly assert.

On March 30, 2011, the Court issued an order that, among other things, denied Seagate's motion to dismiss Shukh's discrimination and retaliation claims.  *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 1258510, *1 (D. Minn. Mar. 30, 2011). With respect to Shukh's discrimination claims under Title VII and the MHRA, the Court noted that Shukh's allegations of discrimination "included disparate treatment in pay, promotions, and denial of recognition and inventorship." *Id.* at *12.  The Court found that the complaint adequately alleged continuing violations for purposes of tolling the statute of limitations. *Id.* at *13.  Specifically, the Court explained "[t]hough Shukh has not explicitly alleged that his work environment was 'hostile,' a plain reading of the complaint suggests that it is, in essence, what he claims." *Id.*  The Court also found that Shukh's retaliation claims adequately stated a claim for relief with respect to both pre- and post-termination retaliation. *Id.* at *14.  Specifically, the Court found that Shukh had

adequately pled retaliation "for pre-termination conduct based on allegations relating to his failure to be promoted, and to have his pay increased." *Id.* With respect to post-employment conduct, the Court found that the retaliation was related to "statements and rumors from Seagate [that] have affected [Shukh]'s ability to be hired elsewhere and that he was not rehired for available positions at Seagate despite being well-qualified for them." *Id.*

## ANALYSIS

## I.     STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport*

*v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.    NATIONAL ORIGIN DISCRIMINATION AND RETALIATION

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). It is also unlawful for an employer "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of the employee's national origin. 42 U.S.C. § 2000e-2(a)(2). Similarly, the MHRA makes it unlawful for an employer to "discharge an employee" or "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of an employee's national origin. Minn. Stat. § 363A.08, subd. 2.

Title VII also prohibits an employer from retaliating against an employee for "oppos[ing] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Under the MHRA, it is an "unfair discriminatory practice" for an employer to "intentionally engage in any reprisal" against a person because that person opposed "a practice forbidden under [the MHRA]." Minn. Stat. § 363A.15(1). The Court analyzes an employer's liability under both Title VII and the MHRA using the same legal standards. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011); *Bahr v. Cappella Univ.*, 788 N.W.2d 76, 83 (Minn. 2010).

Although Shukh's brief in response to the present motion is not a model of clarity regarding the scope of his claims, counsel clarified at oral argument that Shukh brings claims for discrimination based on a hostile work environment and his termination.  He also brings claims for retaliation based on a hostile work environment, denial of a promotion to Grade 162 in 2008, and his termination.  Seagate disputes that each of these claims was either properly pled, carved out in the Court's March 2011 order on Seagate's motion to dismiss, or adequately briefed in response to the present motion.  Because the Court concludes that summary judgment in favor of Seagate is warranted on each of these claims, it will assume, without deciding, that Shukh properly raised and preserved the claims he identified at oral argument, and will address each of these claims in turn.

### A.      Discriminatory Hostile Work Environment

A work environment that is hostile because of an employee's national origin violates Title VII.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 798 (8th Cir. 2003).  To establish a claim for hostile work environment based on discrimination a plaintiff must show that (1) he is a member of a protected group, (2) there was unwelcome harassment, (3) there was a causal nexus between the harassment and membership in the protected group, and (4) the harassment affected a term, condition, or privilege of employment.  *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 942 (8th Cir. 2010); *see also Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 571 n.11 (Minn. 2008).  "To the extent non-supervisory employees are responsible for the harassment, 'the plaintiff must also show that the employer knew or should have known about the harassment but failed to take proper action.'"  *Watson*, 619

F.3d at 941 (quoting *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 794 (8th Cir. 2004)).

 To establish that harassment altered a term, condition, or privilege of employment, a plaintiff must "show that it was 'severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive.'" *Diaz*, 318 F.3d at 800 (quoting *Harris*, 510 U.S. at 21).  This standard "is a demanding one, and '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' will not suffice."  *Watson*, 619 F.3d at 942 (alteration in original) (quoting *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006)).  Instead, the plaintiff must demonstrate that the workplace was "permeated with discriminatory intimidation, ridicule, and insult."  *Id.* (internal quotation marks omitted). And the "'[m]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to support a claim of hostile work environment.'"  *Id.* (alteration in original) (quoting *Arraleh*, 461 F.3d at 979).  "The environment must be both objectively hostile to a reasonable person and subjectively hostile to the victim."  *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005).

 The Court assesses the existence of a hostile work environment "based on the totality of the circumstances."  *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 809 (8th Cir. 2008).  Specifically, the Court examines "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance."
*Arraleh*, 461 F.3d at 979 (internal quotation marks omitted).

Shukh alleges that he was subjected to a hostile work environment because of (1) the comment by Brown asking Shukh what he was doing here or doing in this country, (2) Allen's threat that he would get ten complaints against Shukh, (3) Seagate's failure to follow its policies in investigating a complaint of national origin discrimination, (4) failure to be named on patents, (5) physical isolation, (6) exclusion from meetings, and (7) prohibition on communicating with colleagues. Although not specifically addressed in connection with his hostile work environment claim it is also possible that Shukh relies upon the comments made by Ryan that "nobody will listen to you."[8]

---

[8] Counsel clarified at oral argument that the various other grievances listed in Shukh's brief were not the basis of his hostile work environment claim. The Court notes, however, that its analysis would be the same even if it considered the totality of the examples of discrimination listed in Shukh's brief. (*See* Pl.'s Opp. to Mot. for Summ. J. at 38-40, May 6, 2013, Docket No. 488.) The only incidents cited by Shukh that have any relationship to his national origin are instances in which Shukh himself put his national origin at issue. For example, as evidence of discrimination Shukh cites his own September 2006 email to Ryan, Allen, Brown and Reutiman in which he stated "I recognized long ago that [I] cannot be a manager at Seagate, maybe since I am Russian" (Ninth Gekas Decl., Ex. 13 at 46215) and his January 2008 communication to Glembocki in which he indicated his belief that there was a decision about him at Seagate that he would never be a manager "[o]f course, because I am Soviet" (*id.*, Ex. 18). Although, as discussed below, Shukh's comments may be relevant to retaliation, a plaintiff cannot manufacture a discrimination claim by repeatedly invoking his own protected status in response to work place occurrences. Instead, Shukh must present evidence upon which a reasonable jury could conclude that anyone at Seagate, other than Shukh, put his national origin at issue, and used it to harass him or subject him to adverse employment actions. The other incidents identified by Shukh have no bearing upon his national origin, and he has not demonstrated how a reasonable jury could identify them as such. For example, Shukh cites to an incident in early 2006 when Allen warned Shukh that he "must stop talking about [his own] designs. This is team work, this is team designs. This is your last chance to work at this company, otherwise you will not find a job anywhere." Although this statement evidences hostility between Allen and Shukh, Shukh has presented no evidence as to how this statement could be related to his national origin

(Footnote continued on next page.)

The Court finds that these facts, taken as a whole, fail to present sufficient evidence upon which a reasonable jury could find both that there was a causal connection between those incidents and Shukh's national origin and that the harassment was so severe or pervasive as to affect a term, condition, or privilege of his employment.  The only incidents alleged by Shukh that contain any possible inference of a relationship to his national origin is the statement by Brown asking Shukh what he was doing in this country and the comment by Ryan that no one would listen to Shukh, which Shukh attributed to refer to his accent.  Even if a jury could construe these statements as evidencing discriminatory animus based on Shukh's national origin, two isolated statements over the course of eleven years of employment is insufficient to meet the high standard for demonstrating the existence of a hostile work environment.  *See Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1195 (8th Cir. 2006) (finding that three to four racially offensive comments and additional sexually offensive comments were a "limited number of offensive comments . . . insufficient to create a hostile work environment"); *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005) (finding no hostile work environment where plaintiff "produced only a few comments [a supervisor] allegedly made over a ten-month period.  Most of these offhand and isolated comments were wholly unrelated to each other and had a tenuous connection to race, sex, religion or national origin.  [The] comments were infrequent, were not severe, never physically

_____

(Footnote continued.)

or anything other than the problems that he was experiencing at Seagate in attempting to ensure that he received what he perceived to be appropriate credit for his work.

- 40 -

threatened Al-Zubaidy, were more akin to mere offensive utterances, and did not interfere with Al-Zubaidy's work performance.").

With respect to the other bases for his hostile work environment claim – such as Allen's threat to obtain ten complaints against Shukh, isolation, and failure to follow policies – Shukh has presented no evidence that would allow a reasonable jury to conclude that a causal connection existed between these incidents and his national origin. *See Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000) (finding no hostile work environment where there was no evidence of a "causal nexus between the complained of harassment and the protected status of [plaintiff]").   Although "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII" in order to be actionable they must be "part of a course of conduct which is tied to evidence of discriminatory animus."   *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999).   Shukh has not presented evidence linking the complained of conduct to the isolated statements of Brown and Allen such that a jury could reasonably conclude all of the conduct was "part of the same pattern of harassment."   *See Diaz*, 318 F.3d at 800 (finding that a supervisor's rude noises, laughter, and statements that plaintiff was stupid were sufficiently related to her Hispanic status because the supervisor had made earlier comments "in which she demeaned Hispanics and specifically referred to both Hispanics and [plaintiff] as 'stupid'").   Therefore, those comments do not make Seagate's otherwise neutral actions discriminatory.

The only record evidence possibly linking the incidents at Seagate to Shukh's national origin in his own testimony that he believed his national origin was the reason

for his alleged mistreatment at Seagate.  (*See, e.g.*, Shukh Dep. 456:13-457:17 (testifying that he was discriminated against because he "was so different" and was not promoted to manager because of his "strong accent"); *id.* 617:10-20 (testifying the he believed that in his managers' "mindset I am Soviet and in their mindset they [are] still at war with the Soviets . . . . It seems to me [the] obvious explanation of their absolutely irrational behavior."); *id.* 666:3-14 (explaining his belief that he was discriminated against due to his national origin because "from the very beginning of my employment the whole picture of relation . . . how they treated me, my achievement and the history, how this kind of pressure intensified while the time, when especially I started to complain, this is obvious to me.  It's obvious this is retaliation, severe discrimination.").)  This is insufficient to satisfy the evidentiary showing required to survive summary judgment on a hostile work environment claim.  *See Bradley v. Widnall*, 232 F.3d 626, 632 (8th Cir. 2000) ("Bradley has also been unable to provide any evidence, either directly or by inference, beyond her own speculation, that her alleged mistreatment was due to her protected status.  To the contrary, close scrutiny of the record reveals that the majority of the problems encountered by Bradley stemmed from inter-office politics and personality conflicts rather than race based animus."), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).  Because Shukh has failed to present sufficient evidence that any potentially discriminatory comments were severe or pervasive enough to create a hostile work environment and that other employment actions were causally connected to his national origin, the Court will grant Seagate's motion for summary judgment with respect to his discriminatory hostile work environment claim.

**B.     Retaliation**

In the absence of direct evidence, retaliation claims are analyzed under the *McDonnell Douglas* burden shifting framework. *See Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 978 (8th Cir. 2012); *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011).[9]  Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of retaliation by showing that (1) he engaged in protected conduct, (2) he suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct. *Guimaraes*, 674 F.3d at 978. After a plaintiff establishes a prima facie case, the burden of production shifts to the employer "to produce a legitimate, non-retaliatory reason for the action it took against the plaintiff." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005) (internal quotation marks omitted).  If the employer identifies a legitimate, non-retaliatory reason

---

[9] Shukh's brief does not delineate between direct evidence and the evidence necessary to survive summary judgment under the *McDonnell Douglas* test, nor does it specify what test he intends to proceed under.  Direct evidence of retaliation is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  *Torgerson*, 643 F.3d at 1044 (internal quotation marks omitted). "'[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).  "'Direct evidence' does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'"  *Browning v. President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 635 (8th Cir. 1998) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).  The Court has reviewed the record and found no evidence of retaliation that demonstrates a specific link between the alleged retaliation and any protected conduct that would meet the standard of direct evidence. *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012) ("[Direct] evidence must be 'strong' and must 'clearly point[ ] to the presence of an illegal motive' for the adverse action." (alteration in original) (quoting *Griffith*, 387 F.3d at 736)); *Harnan v. Univ. of St. Thomas*, 776 F. Supp. 2d 938, 944 (D. Minn. 2011) (holding that vague comments subject to nondiscriminatory interpretations do not constitute direct evidence of discrimination)

for the action "the burden returns to the plaintiff who is then obliged to present evidence that (1) creates a question of fact as to whether defendant's reason was pretextual and (2) creates a reasonable inference the defendant acted in retaliation." *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007) (alterations and internal quotation marks omitted).   There must be a genuine issue of material fact at any step of the *McDonnell Douglas* analysis to defeat a defendant's motion for summary judgment. *See Riley v. Lance, Inc.*, 518 F.3d 996, 1000 (8th Cir. 2008).

## 1.    Protected Conduct

Seagate first argues that Shukh has not presented a prima facie case of retaliation because he did not engage in protected conduct.  Specifically, Seagate argues that during his employment Shukh never complained that he was being discriminated against based on his Belarusian national origin.  "A retaliation claim requires that the plaintiff have engaged in protected conduct, or, as the Civil Rights Act of 1964 states, 'oppos[ing] any practice made an unlawful employment practice by this title.'" *Smith v. Int'l Paper Co.*, 523 F.3d 845, 848-49 (8th Cir. 2008) (alteration in original) (quoting 42 U.S.C. § 2000e-3(a)).  Discrimination on the basis of national origin is one such unlawful employment practice. *Id.* at 849.  "[C]omplaints do not constitute protected activity for purposes of a retaliation (or reprisal) claim unless they implicate race or some other illegitimate criterion." *Colenburg v. STARCON Int'l, Inc.*, 656 F. Supp. 2d 947, 957 (D. Minn. 2009); *see also Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002) ("While Hunt complained that she was entitled to a pay increase and a change in job title, she did not attribute NPPD's failure to give her a raise or a promotion to sex

discrimination.   Thus, Hunt has not engaged in a protected activity for the purposes of Title VII . . . .").   Therefore "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."   *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Although Shukh's brief raised a host of complaints that he made to Seagate, many of which are unrelated to his national origin, counsel clarified at oral argument that Shukh engaged in protected conduct (1) in responding to his performance evaluation for fiscal year 2006 when he stated "I found out long ago that there is a strong bias to me," and "You can always give me an 'E' for not going to café during lunch time, for a strong Russian accent, etc." (2) when he sent an email to Ryan in September 2006 in which he stated "I recognized long ago that [I] cannot be a manager at Seagate, maybe since I am Russian," and (3) when he sent the January 2007 letter to the human resources department in which he stated that his "human rights" were being violated, he was convinced that "there has been a persistent strong bias of . . . managers against me," and that he was being subjected to unfair working conditions.

The **numerous** complaints identified in Shukh's brief that he made to various supervisors at Seagate that were unrelated to his status as a Belarusian or referenced unfair treatment only generally do not constitute protected conduct.   *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000) (finding no protected conduct where instead of alleging pregnancy discrimination plaintiff's "complaints instead concerned a **general** displeasure with being paid less than her co-workers" (emphasis in

original)).   Similarly, the January 2007 letter to human resources fails to identify national origin as a basis for his complaint.  Although the letter uses the terms "human rights," "strong bias," and "unfair," these terms would not alert a reasonable person to the fact that Shukh was making complaints that he was being mistreated because of his Belarusian national origin.  *See Smith*, 523 F.3d at 850 (explaining that an employee engages in protected conduct only if a reasonable person could believe that the complaints were protected under Title VII); *see also Tomanovich*, 457 F.3d at 664 (explaining that raising "issues of harassment" was insufficient to indicate that the alleged harassment was based upon his sex).  With respect to the 2006 evaluation and the September 2006 email to Ryan, however, the Court concludes that the complaints contained in these communications – albeit somewhat vague – were sufficient to put a reasonable person on notice that Shukh's complaints were related to discrimination based on his national origin.[10]  Having determined that Shukh engaged in protected conduct, the Court will go on to consider whether each of Shukh's retaliation claims involved an adverse employment action and whether any adverse employment actions were causally linked to the protected conduct in his 2006 evaluation and September 2006 email.

---

[10] Although the statement in Shukh's 2006 evaluation was related specifically to his accent, not his national origin, this is likely sufficient to constitute protected conduct because "comments ridiculing an employee's accent may be relevant evidence of national-origin animus." *Guimaraes*, 674 F.3d at 974; *see Hossaini v. W. Mo. Med. Ctr.*, 97 F.3d 1085, 1086, 1089 (8th Cir. 1996) (finding that a reasonable jury could infer a discriminatory motive where, among other things, the defendant "ridiculed [plaintiff]'s accent" and "imitated it").

## 2.      Hostile Work Environment

Shukh first argues that Seagate created a hostile work environment as retaliation for his complaints of discrimination.  The Eighth Circuit has recognized that "retaliation claims under Title VII c[an] be based on a hostile work environment and need not be based solely on discrete adverse employment actions that affect the terms or conditions of employment."  *Stewart*, 481 F.3d at 1042 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66-67 (2006)).  In a prima face case for retaliation, proof of a hostile work environment satisfies plaintiff's burden of demonstrating that he suffered a materially adverse employment action.  *Id.* at 1044-45.

Shukh appears to advance the same basis for his retaliatory hostile work environment claim as he did for his discriminatory hostile work environment claim. Specifically (1) the comment by Brown asking Shukh what he was doing here or doing in this country, (2) Allen's threat that he would get ten complaints against Shukh, (3) Seagate's failure to follow its policies in investigating a complaint of national origin discrimination, (4) failure to be named on patents, (5) physical isolation, (6) exclusion from meetings, (7) prohibition on communicating with colleagues, and possibly (8) comments made by Ryan that "nobody will listen to you."

The problem with the basis for Shukh's retaliatory hostile work environment claim is that he cannot establish that many of the adverse actions he relies on are causally linked to his protected conduct because they occurred prior to his protected conduct in

raising complaints in his 2006 evaluation[11] and the September 2006 email to Ryan.  *See Stewart*, 481 F.3d at 1044 ("[A]lleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event.").  The comment by Brown took place in January 2006, prior to any protected conduct.  Additionally, with respect to the failure to be named on patents, Shukh testified that Seagate stole his intellectual property "continuously from the very beginning of [his] employment through the end of [his] employment."  (Shukh Dep. 502:23-503:3.)  Shukh also testified that projects he originated were given to other Seagate engineers to develop as early as 1998.  As for exclusion from meetings and prohibition on communicating with colleagues, Shukh testified that his isolation from others at work began in February 1998. Shukh cited examples from 2002, 2004, and 2005, in which coworkers indicated that they would not work with Shukh and that he had stopped being invited to tech review sessions, writer team meetings, and roadmap development.   Because this conduct occurred prior to Shukh's protected conduct, it cannot form the basis of a retaliatory hostile work environment.  *See Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 933 (8th Cir. 2011) (finding that there was no causal connection between protected activity and adverse employment actions where the actions occurred "sometime before" plaintiff's reports of discrimination).

---

[11] The record reflects that the evaluations for a particular year were conducted in the summer and fall of the given year.  Thus, Shukh's comments in his 2006 evaluation were likely made during that time period.

Therefore, the only actions or incidents that could properly form the basis of a retaliatory hostile work environment are Allen's threat that he would get ten complaints against Shukh, Seagate's failure to follow its policies in investigating a complaint of national origin discrimination, a threat of physical isolation,[12] and the comment made by Ryan that "nobody will listen to you."   These incidents, even if causally related to Shukh's protected conduct, are not sufficient to meet the demanding standard of a hostile work environment.  *See Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 788 (8th Cir. 2007) ("As for her claims she was denied a Route Builder, was unfairly disciplined, was paid less than male RMs, was not allowed to expense pay phone calls, and was required to make inventory changes on the computer, they, at best, amount to a frustrating work environment rather than an objectively hostile work environment."), *abrogated on other grounds by Torgerson*, 643 F.3d 1031 (8th Cir. 2011); *see also Bradley*, 232 F.3d at 631-32 (finding allegations that plaintiff's "supervisory duties were curtailed, that she was left out of the decision-making process, treated with disrespect, and subject to false complaints . . . may have resulted in a frustrating work situation [but were not] so severe or pervasive as to have affected a term, condition, or privilege of her employment"). Although Shukh argues that many of the alleged actions may have been taken against him due to cultural differences, and his direct style with coworkers, employers are allowed to require a certain level of conduct in the workplace, regardless of an employee's national

---

[12] The Court notes that although Allen communicated with Engelke that he may consider physically isolating Shukh, the record does not reflect that this physical isolation occurred. Instead, the isolation Shukh testified to was his inability to work with other engineers and his exclusion from important meetings.

origin.  *See Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 613-14 (7th Cir. 2013).  Because Shukh has failed to demonstrate a prima facie case with respect to his retaliatory hostile work environment claim, the Court will grant Seagate's motion for summary judgment with respect to this claim.

### 3.      Failure to Promote

Shukh also alleges that his failure to be promoted to Grade 162 in 2008 was retaliation for engaging in protected conduct.  It appears that the basis for this claim is the comment in Shukh's 2008 evaluation in which Allen states:

> Overall, I am pleased with Alex's progress in FY08 – especially in the past four to six months; I would have rated Alex as a "4" performer over this time period and intend to reflect that in the KCPB cycle.  However, I have not yet seen sufficient sustained contribution to promote Alex to Grade 162 as per his request – but I will go forward out of cycle if I see improved integration and commitment to the larger team's needs, and continue to see adequate teamwork.

(Benjes Decl., Ex. 5 at 46661.)

To establish a prima facie case, Shukh must present evidence of a causal connection between his protected conduct and the adverse employment action, showing that Seagate's "retaliatory motive played a part in the adverse employment action."  *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (internal quotation marks omitted).  "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."  *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (internal quotation marks omitted).  Where a plaintiff relies solely upon a temporal connection to show causation the protected conduct and the adverse employment action must occur

close in time.  *See Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005);

*see also Sisk*, 669 F.3d at 901 ("More than two months is too long to support a finding of

causation without something more.").

Shukh has not identified evidence in the record establishing that Allen's decision

not to promote him was due to retaliation in response to Shukh's complaints of

discrimination in 2006.   Accordingly, Shukh can only rely on temporal proximity to

establish a causal connection between his protected activity and his failure to be

promoted.   But here the record reflects that Allen's evaluation denying Shukh's

promotion was prepared in the summer of 2008 – almost two years after Shukh engaged

in the protected conduct.  *See Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893,

897 (8th Cir. 2002) ("Here, the interval of two months between the complaint and Ms.

Kipp's termination so dilutes any inference of causation that we are constrained to hold

as a matter of law that the temporal connection could not justify a finding in Ms. Kipp's

favor on the matter of causal link.").[13]

Furthermore, even if the protected activity and the 2008 promotion denial were

closer in time "evidence that the employer had been concerned about a problem before

the employee engaged in the protected activity undercuts the significance of temporal

proximity."  *Chivers*, 641 F.3d at 933 (alterations and internal quotation marks omitted).

Here, the record reflects concerns with Shukh's team work dating back to evaluations

---

[13] Even if the Court views additional incidents in the record, such as Shukh's forwarding
of the September 2006 email to Engelke in January 2007 and his January 2008 complaint
to Glembocki that he could not be manager because he is Soviet, as separate protected conduct, the
timeline between the protected conduct and the failure to be promoted remains too broad to
support an inference of causation between the protected conduct and the retaliation.

completed in 1999.  Therefore, Allen's reliance on documented issues with Shukh's team work in denying the promotion would serve to undercut the significance of any temporal proximity.   Finally, Shukh **was** promoted to the position of principal engineer in September 2006 after the protected conduct at issue occurred.  This promotion post-dating Shukh's protected conduct suggests that Shukh's failure to be promoted in 2008 was not the result of a retaliatory motive.  Because Shukh has not demonstrated a causal connection between any protected conduct and his failure to be promoted in 2008, the Court will grant Seagate's motion for summary judgment with respect to that claim.

### 4.   Termination

Shukh also claims that he was terminated in retaliation for engaging in protected conduct.  Shukh was terminated in January 2009, which is even further in time from the protected conduct than his failure to be promoted.  Accordingly, in the absence of other evidence demonstrating that Shukh's termination was related to his protected conduct, the Court similarly finds that Shukh has failed to demonstrate a causal connection between his protected activity and Seagate's termination decision.  *See Recio v. Creighton Univ.*, 521 F.3d 934, 941 (8th Cir. 2008) (holding that six months was not close enough to raise inference of causation).

### C.   Discriminatory Termination

Finally, Shukh argues that Seagate terminated him because of his Belarusian national origin.  As with Shukh's retaliation claims, the Court analyzes this claim under the *McDonnell Douglas* burden-shifting analysis because the record does not reveal any

direct evidence of discriminatory termination.  To establish a prima facie case of discrimination, Shukh must establish that (1) he is a member of a protected class, (2) he met Seagate's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination.  *Guimaraes*, 674 F.3d at 973-74.  Here, Shukh's termination occurred as the result of an undisputed bona fide reduction in force.  Once an employer has demonstrated that the employee was terminated based on a bona fide reduction in force, the plaintiff "'then must show that the nondiscriminatory reason is a pretext for discrimination, and . . . that the protected criteria . . . was a factor in the adverse employment decision.'"  *Hillins v. Mktg. Architects, Inc.*, 808 F. Supp. 2d 1145, 1152 (D. Minn. 2011) (quoting *Groves v. Cost Planning & Mgmt. Int'l, Inc.*, 372 F.3d 1008, 1009 (8th Cir. 2004)).

In the hundreds of pages of depositions and Shukh's recounting of eleven years of employment, he has identified only three statements – made by someone other than himself – that could possibly give rise to a suggestion of discriminatory animus on the basis of his national origin.  These statements include (1) Brown's January 2006 statement, "What are you doing here in this country?" (2) Ryan's September 2006 statement, "Nobody will listen to you" and (3) Allen's statement, "every success in building a new political party in Belarus" made when walking Shukh out of Seagate's Bloomington office on his last day of employment.  Even if these statements were sufficient to establish a prima facie case, the Court finds that Shukh has failed to demonstrate that his termination as part of a reduction in force was pretext for illegal discrimination.

A plaintiff may demonstrate a material issue of fact with respect to pretext by showing that an employer's explanation is unworthy of credence because it has no basis in fact or that a prohibited reason more likely motivated the employer. *See Torgerson*, 643 F.3d at 1047. "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." *Id.* "[A]n employee's attempt to prove pretext requires more substantial evidence than it takes to make a prima facie case, because unlike evidence establishing a prima facie case, evidence of pretext is viewed in light of the employer's justification." *Logan*, 416 F.3d at 881 (alterations and internal quotation marks omitted). Although the evidentiary burden that a plaintiff must meet at the prima facie stage is minimal, "[w]here the evidence used to establish a prima facie case meets this minimal burden but is not strong, that evidence, standing alone, may be insufficient to sustain the plaintiff's case at the final stage of the burden-shifting analysis." *Stewart*, 481 F.3d at 1043.

Here Shukh argues that Seagate's stated reasons for termination are pretext because (1) Seagate shifted its explanation of the reasons for his termination and (2) the accusations that Shukh had numerous interpersonal conflicts with co-workers and management are false. Although evidence that an employer shifted its explanation can support a finding of pretext, *see Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 875 (8th Cir. 2010), the Court finds that Shukh has failed to show that Seagate shifted its explanation.

Allen explained that Shukh's termination was part of the reduction in force. In determining what employees should be eliminated, Allen assigned points to employees in his department based on whether the employee's position could be eliminated,

performance history, documented counseling for performance, misconduct or attendance issues, technical or specialized skills and length of service.  Allen recommended that Shukh's position be eliminated because elimination of his managerial position would generate more money savings, and he had scored lower on the rubric than the other seven managers.  Allen also determined that Shukh's primary skill in RSS modeling was already sufficiently available at Seagate, and therefore retention of employees with more development and product design engineering experience was preferred.  This is identical to the explanation for termination given in Seagate's brief in support of the present motion.  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 12-13, Apr. 1, 2013, Docket No. 467.)

Shukh contends that Seagate shifted its explanation of the reason for his termination in its response to the EEOC when it stated that "Shukh's unsupported allegations are at direct odds with the facts surrounding his employment.  After a history of combative and unproductive behavior in his working relationships, Shukh was selected for termination in connection with a Company-wide reduction in force conducted by Seagate."  (Ninth Gekas Decl., Ex. 26.)  This document, however, does not contradict Allen's stated reasons for Shukh's termination.  Although the document references the history of combative and unproductive behavior in his working relationships, it does not cite that history as the reason for Shukh's termination.  Rather, consistent with Allen's testimony and the brief in support of this motion, the EEOC response indicates that "Shukh was selected for termination in connection with a Company-wide reduction in

force conducted by Seagate." (*Id.*)  Accordingly, the EEOC response does not provide evidence of pretext through a shifting explanation.

Shukh also contends that Seagate shifted its explanation in its brief in support of the present motion when it stated that the reason for Shukh's layoff was his "[i]nability to develop productive relationships with co-workers." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 7, Apr. 1, 2013, Docket No. 467.)  But Seagate's brief never states that this was the reason for Shukh's layoff.  Instead, the brief merely indicates that "[t]he record is replete with examples of Shukh's inability to develop productive relationships with co-workers." (*Id.*)  Given the host of adverse employment actions Shukh claimed he suffered in support of his discrimination and retaliation claims, the inclusion of Shukh's history with coworkers at Seagate was relevant to this motion independent of Shukh's termination claim.  Therefore, Seagate's inclusion of this information in its brief cannot fairly be interpreted as an explanation of the reasons for Shukh's termination, particularly in light of the fact that the brief specifically discusses the reason for Shukh's termination as arising out of the reduction in force. (*Id.* at 12-13.)  Therefore, Seagate's brief does not provide evidence of pretext, because it does not demonstrate that Seagate has shifted its explanation for Shukh's termination.

Finally, Shukh contends that Seagate has shifted its explanation of the reasons for his termination because, in his deposition, Allen admitted that although the difficulties he had with Shukh were not the primary reason for his termination, they may have been part "of the secondary set of factors." (Allen Dep. 174:10-14.)  This testimony does not establish a shifting explanation, as it does not contradict that the stated reasons for

Shukh's termination in connection with the reduction in force were the primary factors for his termination.  Even if this testimony provided evidence of a shifting explanation, it does not provide sufficient evidence of pretext to demonstrate a triable question of fact, because it does not show a genuine issue as to whether Allen acted "based on an intent to discriminate."  *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 855 (8th Cir. 2012).  "[I]n the context of the *McDonnell Douglas* analytical framework, a court's use of the words 'pretext,' 'pretextual' or similar terminology, often must be read as shorthand for indicating that a defendant's proffered discriminatory explanation for adverse employment action is a pretext **for unlawful discrimination**, not that it is merely false in some way."  *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017 (8th Cir. 2005) (emphasis in original).  Therefore, ultimately it is insufficient for Shukh to simply cast doubt on Seagate's true reason for termination because he has presented no evidence upon which a reasonable jury could find that he meets his "ultimate burden of proof and persuasion that [Seagate] discriminated against [him] based on [his] national origin." *Guimaraes*, 674 F.3d at 976 (internal quotation marks omitted).

At most, Allen's testimony shows that Shukh's history of conflicts with coworkers and managers was a secondary factor in his termination, but this is not a prohibited basis for termination.  The record reflects that throughout his employment, managers and coworkers consistently found Shukh to be wanting in the areas of teamwork and interpersonal skills.  Although Shukh has presented evidence that certain coworkers did not experience problems working with him, this testimony is irrelevant because "[t]he relevant inquiry is whether [Seagate] **believed** [Shukh] was guilty of the conduct

justifying discharge." *Chivers*, 641 F.3d at 934 (emphasis in original) (internal quotation marks omitted).  Here, Shukh has presented no evidence – and the record does not reflect – that a reasonable jury could conclude that Allen did not genuinely believe that Shukh had difficulty working with managers and coworkers.  Accordingly, even if Allen relied on conflicts with Shukh as a secondary factor in his termination, this is insufficient to demonstrate pretext.  *See Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 725 (8th Cir. 2008) ("Hervey also disagrees with Mastin's assessment of her insubordinate behavior and poor performance, but her evidence must do more than raise doubts about the wisdom and fairness of the supervisor's opinions and actions.  It must create a real issue as to the genuineness of the supervisor's perceptions and belief.").  Therefore, the Court finds that Shukh has failed to demonstrate a material issue of fact with respect to pretext, and will grant Seagate's motion for summary judgment with respect to his discriminatory termination claim.

Although the Court is not without empathy for what appears to have been a difficult decade of employment, it concludes, based upon a thorough review of the voluminous record, that Shukh has failed to articulate that the difficulties he experienced were due to his national origin.  In other words, although a reasonable jury could determine that the relationship between Shukh and Seagate was rife with conflicts and that Seagate may have mistreated Shukh, it could not – based upon the evidence presented here – conclude that the conflicts and mistreatment were a result of Shukh's national origin and in violation of the law.  Accordingly, summary judgment in Seagate's favor with respect to Shukh's discrimination and retaliation claims is appropriate.

**ORDER**

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' Motion for Summary Judgment [Docket No. 465] is **GRANTED**. Counts nine, ten, eleven, and twelve of Plaintiff's Third Amended Complaint are **DISMISSED with prejudice.**

2.     Defendants' Motion to Exclude the Expert Report and Opinions of Dr. Henry Lahmeyer [Docket No. 443] is **DENIED as moot**.

3.     Defendants' Motion to Exclude the Expert Report and Opinions of Edward Grochowski, Ph.D. [Docket No. 448] is **DENIED as moot**.

4.     Defendants' Motion to Exclude the Expert Report and Opinions of Howard B. Rockman [Docket No. 454] is **DENIED as moot**.

5.     Plaintiff's Motion to Bar Expert Report and Testimony of Angela M. Heitzman [Docket No. 480] is **DENIED as moot**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED: March 31, 2014                                    _____
at Minneapolis, Minnesota.                                            JOHN R. TUNHEIM
                                                                                  United States District Judge